KAMALA D. HARRIS
Attorney General of California
JAMEE JORDAN PATTERSON
DAVID A. ZONANA
Supervising Deputy Attorneys General
GEORGE TORGUN, SBN 222085
DAVID ALDERSON, SBN 231597
Deputy Attorneys General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-1002
  Fax:  (510) 622-2270
  E-mail:  George.Torgun@doj.ca.gov

*Attorneys for Plaintiffs People of the State of
California, ex rel. Kamala D. Harris, Attorney
General, and California Coastal Commission*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA, ex rel. KAMALA D. HARRIS, ATTORNEY GENERAL, and CALIFORNIA COASTAL COMMISSION,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF OCEAN ENERGY MANAGEMENT; BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT; RICHARD YARDE,** Regional Supervisor, Bureau of Ocean Energy Management; and **DAVID FISH,** Acting Chief, Environmental Compliance Division, Bureau of Safety and Environmental Enforcement,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*; National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.*) |

**JURISDICTION AND VENUE**

1.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to Plaintiff), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

2.    Defendants' issuance of a Final Programmatic Environmental Assessment and Finding of No Significant Impact on May 27, 2016 are final agency actions and are therefore judicially reviewable within the meaning of the Administrative Procedure Act.  5 U.S.C. §§ 704, 706.

3.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because at least one Defendant resides in this District and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.  This case is also related to two previously-filed actions in this District:  *Environmental Defense Center, et al. v. Bureau of Ocean Energy Management*, *et al.*, Case No. 2:16-cv-08418 (C.D. Cal., compliant filed Nov. 11, 2016) and *Center for Biological Diversity, et al. v. Bureau of Ocean Energy Management, et al.*, Case No. 2:16-cv-08473 (C.D. Cal., compliant filed Nov. 15, 2016).

**INTRODUCTION**

4.    The People of the State of California (the "People") and the California Coastal Commission ("Commission") (collectively, "Plaintiffs") bring this action to challenge the Final Programmatic Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") issued by the United States Department of the Interior, *et al.* ("Defendants") for the Proposed Action: well stimulation treatments ("WSTs"), including hydraulic fracturing and acidizing, at 22 production platforms

on 43 lease areas on the Southern California Outer Continental Shelf ("Pacific OCS"). Despite the substantial record evidence showing the potential for significant environmental effects from offshore WSTs, Defendants improperly concluded that allowing such activities would result in no significant impacts, in violation of the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. Defendants also violated NEPA by relying on unfounded assumptions rather than taking a "hard look" at the potential environmental impacts, defining the Final Programmatic EA's statement of purpose and need in unreasonably narrow terms, and failing to consider all reasonable alternatives to the Proposed Action.

5. In addition, Defendants violated the Coastal Zone Management Act ("CZMA"), 16 U.S.C. § 1451 *et seq*., by failing to determine whether the Proposed Action is consistent to the maximum extent practicable with the enforceable policies in California's coastal zone management program.

6. Accordingly, Plaintiffs seek a declaration that Defendants' issuance of the Final Programmatic EA and FONSI violated NEPA. Plaintiffs also seek a declaration that Defendants violated the CZMA by failing to determine whether the Proposed Action is consistent to the maximum extent practicable with the enforceable policies in California's coastal zone management program. Plaintiffs seek an injunction requiring Defendants to vacate and set aside their approvals and prohibiting further offshore WSTs on the Pacific OCS unless and until Defendants comply with applicable law.

## PARTIES

7. Plaintiff, the PEOPLE OF THE STATE OF CALIFORNIA, brings this action by and through Attorney General Kamala D. Harris. The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests, including actions to prevent the destruction, pollution, or irreparable impairment of the environment or natural

1   resources of the State.  Cal. Const., art. V, § 13; Cal. Gov. Code §§ 12600-12612.

2   This challenge is brought pursuant to the Attorney General's independent

3   constitutional, statutory, and common law authority to represent the public interest.

4       8.    The People have an interest in the use and enjoyment of California's

5   coastline and coastal resources, and in preserving and protecting this ecosystem.

6   The People rely on Defendants' compliance with the procedural and substantive

7   requirements of NEPA and the CZMA in order to obtain timely and accurate

8   information about activities that may have significant adverse effects on the coastal

9   zone, and to meaningfully participate in the decision-making process.  Defendants'

10  failure to comply with NEPA and the CZMA adversely affects the People by

11  thwarting public participation and by failing to adequately protect the coastal

12  environment.  The People have suffered legal wrong because of Defendants'

13  actions and have been adversely aggrieved by the approval of the Final

14  Programmatic EA and FONSI and have standing to bring this action.

15      9.    Plaintiff CALIFORNIA COASTAL COMMISSION is a public agency

16  of the State of California.  The Commission was created by the California Coastal

17  Act of 1976, California Public Resources Code section 30000 *et seq*. ("California

18  Coastal Act"), and has the power to sue and be sued.  Cal. Pub. Res. Code §§

19  30300, 30334.  The Commission is designated as the state coastal zone planning

20  and management agency for CZMA purposes and may exercise any and all powers

21  set forth in that statute.  *Id*. § 30330.  The Commission is authorized to review

22  consistency determinations required by the CZMA regarding whether a federal

23  activity is in conformity with the provisions of the California Coastal Act, which is

24  California's federally-approved coastal zone management program.

25      10.   As described below, on March 23, 2016, the Commission submitted

26  detailed comments to Defendants pointing out significant defects in the Draft

27  Programmatic EA that did not fulfill the requirements of NEPA, as well as the need

28  for Defendants to engage in consistency review regarding offshore WSTs, as

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                           4

1   required by the CZMA.  The Commission is aggrieved by the actions of Defendants
2   and has standing to bring this action.

3       11.  Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is an
4   agency of the United States government and bears responsibility, in whole or in
5   part, for the acts complained of in this Complaint.

6       12.  Defendant BUREAU OF OCEAN ENERGY MANAGEMENT
7   ("BOEM") is an agency of the U.S. Department of the Interior and bears
8   responsibility, in whole or in part, for the acts complained of in this Complaint.
9   BOEM is one of two agencies charged with managing offshore oil and gas
10  resources in federal waters, and is responsible for the review and administration of
11  oil and gas exploration and development plans, as well as environmental reviews of
12  such plans conducted pursuant to NEPA.

13      13.  Defendant BUREAU OF SAFETY AND ENVIRONMENTAL
14  ENFORCEMENT ("BSEE") is an agency of the U.S. Department of the Interior
15  and bears responsibility, in whole or in part, for the acts complained of in this
16  Complaint.  BSEE is one of two agencies charged with managing offshore oil and
17  gas resources in federal waters, and is responsible for permitting offshore drilling
18  operations and ensuring that they comply with safety regulations, inspections,
19  offshore regulatory programs, and oil spill preparedness plan review.

20      14.  Defendant RICHARD YARDE is the Regional Supervisor of the Office
21  of Environment for BOEM, and is sued in his official capacity.  Mr. Yarde has
22  responsibility for implementing and fulfilling BOEM's duties under NEPA and the
23  CZMA and signed the FONSI at issue.

24      15.  Defendant DAVID FISH is the Acting Chief of the Environmental
25  Compliance Division for BSEE, and is sued in his official capacity.  Mr. Fish has
26  responsibility for implementing and fulfilling BSEE's duties under NEPA and the
27  CZMA.

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                              5

**STATUTORY BACKGROUND**

**I.  NATIONAL ENVIRONMENTAL POLICY ACT**

16.  NEPA is the "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1.  The fundamental purposes of the statute are to ensure that "environmental information is available to public officials and citizens before decisions are made and before actions are taken," and that "public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id*. § 1500.1(b)-(c).

17.  To achieve these purposes, NEPA requires the preparation of a detailed environmental impact statement ("EIS") for any "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  As a preliminary step, an agency may first prepare an EA to determine whether the effects of an action may be significant. 40 C.F.R. § 1508.9.  If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001).  However, an EIS must be prepared if "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor." *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998).

18.  To determine whether a proposed project may significantly affect the environment, NEPA requires that both the context and the intensity of an action be considered. 40 C.F.R. § 1508.27.  In evaluating the context, "[s]ignificance varies with the setting of the proposed action" and includes an examination of "the affected region, the affected interests, and the locality." *Id*. § 1508.27(a).  Intensity "refers to the severity of impact," and NEPA's implementing regulations list ten factors to be considered in evaluating intensity, including "[u]nique characteristics of the geographic area such as proximity to … ecologically critical areas," "[t]he

degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," and "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." *Id*. § 1508.27(b).  The presence of just "one of these factors may be sufficient to require the preparation of an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

## II.   COASTAL ZONE MANAGEMENT ACT

19.   The CZMA was enacted in 1972 to provide comprehensive, coordinated planning for the protection of the "coastal zone" (land near the shorelines of coastal states), as well as coastal waters extending seaward to the limits of the United States territorial sea.  As Congress recognized at that time, "[t]he increasing and competing demands upon the lands and waters of our coastal zone…including [the] extraction of mineral resources and fossil fuels…have resulted in the loss of living marine resources, wildlife, nutrient-rich areas, permanent and adverse changes to ecological systems, decreasing open space for public use, and shoreline erosion." 16 U.S.C. § 1451(c).  Accordingly, the primary purposes of the CZMA are "to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations," and "to encourage and assist the states to exercise effectively their responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of the land and water resources of the coastal zone." *Id*. § 1452.

20.   The CZMA provides states that have an adopted coastal management plan with oversight over activities in federal waters, a process known as "consistency review."  *See* 16 U.S.C. § 1456; 15 C.F.R. Part 930.  In particular, any federal agency activity "within or outside the coastal zone that affects any land or

1   water use or natural resource of the coastal zone shall be carried out in a manner

2   which is consistent to the maximum extent practicable with the enforceable policies

3   of approved State management programs." 16 U.S.C. § 1456(c)(1)(A). Federal

4   agencies are required to review their activities "in order to develop consistency

5   determinations which indicate whether such activities will be undertaken in a

6   manner consistent to the maximum extent practicable with the enforceable policies

7   of approved management programs." 15 C.F.R. § 930.36(a). Federal agencies

8   "should consult with State agencies at an early stage in the development of the

9   proposed activity in order to" make a consistency determination. *Id*. If the federal

10  agency finds that the proposed activity is consistent, the federal agency must submit

11  its determination to the applicable state agency for review. *Id*. § 930.34(a)(1). The

12  state agency may concur, conditionally concur, or object to the consistency

13  determination. *Id*. §§ 930.4(a), 930.41(a).

14  **III.   OUTER CONTINENTAL SHELF LANDS ACT**

15       21.   The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et*

16  *seq.*, establishes a framework under which Defendants may lease areas of the outer

17  continental shelf for purposes of exploring and developing oil and gas deposits.

18  *See also* 30 C.F.R. Parts 250, 550. The outer continental shelf is located three

19  nautical miles from the state's coastline and extends seaward to the limits of federal

20  jurisdiction. 43 U.S.C. § 1331(a). Pursuant to amendments enacted in 1978,

21  OCSLA requires that oil exploration and production be balanced "with protection

22  of the human, marine, and coastal environments." *Id*. § 1802(2). OCSLA also

23  requires that Defendants cooperate with affected states "[i]n the enforcement of

24  safety, environmental, and conservation laws and regulations," and provide states

25  with the "opportunity to review and comment on decisions relating to [OCS]

26  activities, in order to anticipate, ameliorate, and plan for the impacts of such

27  activities." *Id*. §§ 1334(a), 1802(5).

28

22.   In the development of an offshore oil well, there are four separate stages required by OCSLA:  "(1) formulation of a five year leasing plan by the Department of the Interior; (2) lease sales; (3) exploration by the lessees; (4) development and production."  *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984).  Of particular relevance here are the requirements of the fourth stage for the development and production of an offshore oil well.

23.   The fourth stage involves the filing and review of a development and production plan ("DPP").  43 U.S.C. § 1351(a).  The DPP must include a description of the specific work to be performed; all facilities and operations located on the OCS directly related to the proposed development; the environmental safeguards that will be implemented; safety standards; an expected rate of development and production; and a time schedule for performance.  *Id*. § 1351(c).  The DPP must also include, among other information, detailed descriptions of the types, quantity, and composition of wastes that will be generated by development and production activities; how such wastes will be disposed of; and mitigation measures designed to avoid or minimize the take of listed species and marine mammals.  30 C.F.R. §§ 550.241-550.254.

24.   OCSLA mandates that Defendants periodically review DPPs based on changes in available information or other onshore or offshore conditions that impact development and production.  43 U.S.C. § 1351(h)(3).  A lessee is required to revise its DPP in several circumstances, including when it changes the type of production; significantly increases the volume of production or storage capacity; increases emissions of an air pollutant to exceed the amount specified in the approved plan; or significantly increases the amount of solid or liquid wastes to be handled or discharged.  30 C.F.R. § 550.283(a).  A lessee must also supplement a DPP if it proposes to conduct activities that require approval of a license or permit which is not described in its approved DPP.  *Id*. § 550.283(b).

25.   Prior to commencing drilling activities, a lessee must also obtain approval of an application for permit to drill ("APD").  30 C.F.R. §§ 250.410-250.418, 550.281(a).  The activities proposed in an APD "must conform to the activities described in detail" in an approved DPP.  *Id*. § 550.281(b).  When a lessee intends to revise its drilling plan or change major drilling equipment, it must submit an application for permit to modify ("APM"), which must include a "detailed statement of the proposed work that would materially change from the approved APM."  *Id*. § 250.465(b)(1).

## IV.   ADMINISTRATIVE PROCEDURE ACT

26.   Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*., a reviewing court shall "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] without observance of procedure required by law."  5 U.S.C. § 706.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   THE PACIFIC OCS AND CALIFORNIA'S INVOLVEMENT WITH FEDERAL OFFSHORE OIL LEASING DECISIONS.

27.   The Final Programmatic EA purports to evaluate the potential environmental impacts of WSTs at the 22 production platforms located on 43 active leases on the Pacific OCS.  The Pacific OCS includes (1) the Santa Barbara Channel, (2) the Santa Maria Basin located offshore from Santa Barbara County, and (3) offshore Long Beach near the boundary of Los Angeles County and Orange County.  Fifteen of the production platforms are located in the Santa Barbara Channel, four are located in the Santa Maria Basin, and three are located off the coast of Long Beach.  The 22 production platforms range from 3.7 to 10.5 miles offshore.

28.    The rich natural and scenic resources of California's central and southern coastal areas adjacent to the Pacific OCS are a defining feature of the state and the basis for some of its largest economic drivers, including recreation and tourism. For example, the Santa Barbara Channel is an area of the Pacific Ocean that separates the mainland of California from the northern Channel Islands, including Santa Barbara, Anacapa, Santa Cruz, Santa Rosa, and San Miguel Islands, which became Channel Islands National Park in 1980.  The waters of the Santa Barbara Channel include several state and federally-designated Marine Protected Areas, including marine reserves and conservation areas.  The Channel Islands National Marine Sanctuary encompasses the waters six nautical miles around Channel Islands National Park.  The Santa Barbara Channel is home to an extremely rich and diverse array of marine species, making it one of the best places for viewing whales, sea otters, seals, sea lions, and other wildlife.

29.    Defendants began awarding leases for the offshore development and production of oil in 1966, and the first offshore platform became operational in 1967.  In January 1969, the nation's first large offshore oil spill occurred in the Santa Barbara Channel after a blow-out on Platform A in the Dos Cuadras Offshore Oil Field.  Within a ten-day period, an estimated 80,000 to 100,000 barrels of crude oil spilled into the Santa Barbara Channel and onto the beaches of Southern California between Goleta and Ventura, as well as the shores of the four northern Channel Islands.  The spill had a significant impact on marine life in the Channel, killing thousands of sea birds and marine mammals such as dolphins, elephant seals, and sea lions.  The spill was also a factor in the passage of both NEPA and the CZMA.  The spill still ranks as the third largest in U.S. history after the 2010 Deepwater Horizon and 1989 Exxon Valdez oil spills, and remains the largest oil spill to have occurred in the waters off California.

30.    Ever since the passage of NEPA and the CZMA, the California Attorney General and the Commission have been involved in litigation and other efforts to

1   ensure that these laws are followed with regard to federal offshore oil and gas

2   activities.  For example, in the 1970s, Attorney General Younger sought to block

3   OCS leases based on the federal government's failure to comply with NEPA.  *See*

4   *California ex rel. Younger v. Morton*, 404 F. Supp. 26 (C.D. Cal. 1975).  On behalf

5   of Governor Brown and the Commission, Attorney General Deukmejian sought to

6   block several OCS leases in the 1980s pursuant to the CZMA, NEPA, and other

7   statutes.  *See, e.g., State of California by and through Brown v. Watt*, 520 F. Supp.

8   1359 (C.D. Cal. 1981); *State of California by and through Brown v. Watt*, 668 F.2d

9   1290 (D.C. Cir. 1981).  Attorney General Van de Kamp was part of a lengthy and

10  ultimately successful effort to convince Congress to amend the CZMA to provide

11  states with authority to review OCS leases.  In recent years, Attorney General

12  Lockyer and the Commission have litigated to protect this CZMA authority and to

13  ensure adequate NEPA review for OCS leases.  *See California v. Norton*, 311 F.3d

14  1162 (9th Cir. 2002).

15       31.   On December 13, 2016, Governor Brown sent a letter to President

16  Barack Obama requesting that the President use his authority under Section 12(a) of

17  OCSLA, 43 U.S.C. § 1341(a), "to permanently withdraw federal waters off the

18  coast of California from new offshore oil and gas leasing and guarantee that future

19  oil and gas drilling in these waters is prohibited."  The Governor noted that

20  "California is blessed with hundreds of miles of spectacular coastline; home to

21  scenic state parks, beautiful beaches, abundant wildlife and thriving communities,"

22  and "large new oil and gas reserves would be inconsistent with our overriding

23  imperative to reduce reliance of fossil fuels and combat the devastating impacts of

24  climate change."

25  **II.   THE GROWING USE OF WELL STIMULATION TREATMENTS AND
        CALIFORNIA SENATE BILL 4.**

26

27       32.   In recent years, the United States has experienced a boom in oil and gas

28  production through the use of WSTs such as hydraulic fracturing and acidizing.

COMPLAINT FOR DECLARATORY AND            12
INJUNCTIVE RELIEF

1   According to the U.S. Energy Information Administration, these treatments, often
2   used in combination with horizontal drilling, have allowed the United States to
3   increase its oil production faster than at any time in its history.  For example, in
4   2000, approximately 23,000 hydraulically fractured wells produced 102,000 barrels
5   of oil per day, making up less than 2% of the national total.  By 2015, the number
6   of hydraulically fractured wells grew to an estimated 300,000, and production from
7   those wells had grown to more than 4.3 million barrels of oil per day, making up
8   about 50% of the total oil output of the United States.  While typically associated
9   with shale formations, hydraulic fracturing has been successfully used in directional
10  and vertical wells, in tight formations and reservoirs, and in offshore crude oil
11  production.

12       33.   Hydraulic fracturing ("fracking") is a well stimulation treatment that
13  involves injecting a mixture of water, sand (used as a "proppant" to keep an
14  induced fracture open during or following a fracture treatment), and chemicals into
15  a well at extremely high pressures to break apart a hydrocarbon-bearing geologic
16  formation to create fissures and passageways through which oil and gas can flow.
17  Upon release of pressure, much of the fracturing fluid along with subsurface fluids
18  flow back to the surface platform and is commonly referred to as "the flowback
19  fluid."  In the offshore context, this flowback fluid is typically discharged to the
20  marine environment following the separation of oil, gas, and water, or is reinjected
21  into the well.  Fluids that are not discharged into the marine environment or
22  reinjected may be transported to the shore for disposal by underground injection.

23       34.   Acid well stimulation ("acidizing") is a well stimulation treatment that
24  uses the application of one or more acids, typically hydrofluoric acid and/or
25  hydrochloric acid, into a well and the underlying geological formation to enhance
26  the production of oil or gas.  Acidizing may be done at high pressures and may be
27  used in combination with fracking and other well stimulation treatments.

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                              13

35.   According to the Final Programmatic EA, there are two primary forms of acidizing used in California:  acid fracturing and acid matrix stimulation.  Acid fracturing is similar to hydraulic fracturing except that instead of using a proppant to keep fractures open, an acid solution is used to etch channels into the rock walls of the fracture, thereby creating pathways for oil and gas to flow to the well.  Acid matrix stimulation (or matrix acidizing) is similar to acid fracturing except that it is performed below fracture pressure and the acid is used to dissolve sediment and mud soils to increase the permeability of the rock and facilitate the flow of oil and gas.  Similar to fracking, in the offshore context, acidizing generates flowback fluids that are discharged to the marine environment, reinjected into the well, or transported to shore for disposal by underground injection.

36.   In response to growing concern about the increased use of these WSTs, California enacted Senate Bill 4 ("SB 4") in 2013.  SB 4, 2013-2014 Leg. Sess. (Chapter 313, Statutes of 2013).  In SB 4, the California Legislature declared that "[p]roviding transparency and accountability to the public regarding well stimulation treatments, including, but not limited to, hydraulic fracturing, associated emissions to the environment, and the handling, processing, and disposal of well stimulation and related wastes, including from hydraulic fracturing, is of paramount concern." *Id*., Section 1(c).

37.   SB 4 set up a regulatory process for WSTs in onshore and offshore areas subject to regulation by the State of California.  *See* Cal. Pub. Res. Code §§ 3160-61; 14 Cal. Code Regs. §§ 1750-89.  SB 4 also required the California Division of Oil, Gas, and Geothermal Resources ("DOGGR"), which regulates the development of oil and gas resources in the state, to conduct an environmental review under the California Environmental Quality Act, Cal. Pub. Res. Code section 21000 *et seq*., to "provide the public with detailed information regarding any potential environmental impacts of well stimulation in the state." Cal. Pub. Res. Code § 3161(b)(3).  On July 1, 2015, DOGGR issued and certified an environmental impact report which

found that WSTs have the potential to cause significant and unavoidable impacts to aesthetics, air quality, biological resources (terrestrial environment), cultural resources, geology, soils and mineral resources, greenhouse gas emissions, land use and planning, public and worker safety, and transportation and traffic.

38.   SB 4 further mandated an independent scientific study on WSTs, including, but not limited to, hydraulic fracturing and acidizing, to "evaluate the hazards and risks and potential hazards and risks that well stimulation treatments pose to natural resources and public, occupational, and environmental health and safety." Cal. Pub. Res. Code § 3160(a).  This study, which was conducted by the California Council on Science and Technology ("CCST"), was released in July 2015 ("CCST Study").  The CCST Study found that "[c]urrent record-keeping practice on stimulations in federal waters (from platforms more than three nautical miles offshore) does not meet the standards set by the pending SB 4 well treatment regulations and does not allow an assessment of the level of activity or composition of hydraulic fracturing chemicals being discharged in the ocean." CCST Study, Executive Summary at 3.  The CCST Study also identified several direct and indirect impacts from well stimulation treatments, including threats to public health and the environment from the unrestricted use of "a large number of hazardous chemicals during hydraulic fracturing and acid treatments." CCST Study, Executive Summary at 5-6.

### III.   LITIGATION CHALLENGING OFFSHORE WELL STIMULATION TREATMENTS ON THE PACIFIC OCS.

39.   Based on records obtained under the Freedom of Information Act in 2013, it was revealed that WSTs, including fracking and acidizing, had been authorized by Defendants on several Pacific OCS offshore oil platforms.  On June 16, 2014, the Commission sent a letter to BSEE and BOEM requesting coordination under the CZMA for hydraulic fracturing and other WSTs on the Pacific OCS.

40.   In late 2014 and early 2015, the Environmental Defense Center and the Center for Biological Diversity filed two separate lawsuits against Defendants in U.S. District Court for the Central District of California.  *Environmental Defense Center v. Bureau of Safety and Environmental Enforcement, et al.*, Case No. 2:14-cv-09281 (C.D. Cal., complaint filed Dec. 2, 2014); *Center for Biological Diversity v. Bureau of Ocean Energy Management, et al.*, Case No. 2:15-cv-01189 (C.D. Cal., complaint filed Feb. 19, 2015).  The lawsuits alleged, among other claims, that Defendants had failed to conduct any environmental review pursuant to NEPA prior to authorizing WSTs, including fracking and acidizing, in Federal waters off California's coastline.

41.   On January 29, 2016, the parties filed a settlement agreement in both cases which required Defendants to develop a programmatic EA under NEPA "to analyze the potential environmental impacts of certain well-stimulation practices on the Pacific OCS, including hydraulic fracturing and acid well stimulation."  The purpose of the Programmatic EA was to allow Defendants to determine whether they would be required to prepare an environmental impact statement ("EIS") or whether a FONSI would be appropriate.  Defendants were required to issue a final programmatic EA by May 28, 2016.  Prior to completion of the EA, Defendants agreed to withhold all approvals of WSTs on the Pacific OCS.

## IV.  DEVELOPMENT OF THE PROGRAMMATIC EA.

42.   Defendants released the Draft Programmatic EA on February 22, 2016. The Draft Programmatic EA considered four alternatives:  (1) Alternative 1: Proposed Action—Allow use of WSTs at 22 production platforms located on 43 leases on the Pacific OCS; (2) Alternative 2: Allow use of WSTs at the 22 production platforms, but only at depths greater than 2,000 feet below the seafloor surface; (3) Alternative 3: Allow use of WSTs at the 22 production platforms, but no open water discharge of WST waste fluids; and (4) Alternative 4: No Action— Allow no use of WSTs at the production platforms.  According to the Draft

1    Programmatic EA, "[t]he purpose of the proposed action is to allow the use of

2    certain WSTs (e.g., hydraulic fracturing) in support of oil production at platforms

3    on the Pacific OCS."  The Draft Programmatic EA found that the Proposed Action

4    of allowing the unrestricted use of WSTs would not result in any significant

5    impacts.

6         43.   During the 30-day comment period, Defendants received comments from

7    approximately 22 governmental agencies, 102 non-governmental organizations, and

8    thousands of individuals.  These included comments from two state agencies, the

9    Commission and DOGGR, as well as from members of the California Legislature,

10   that were critical of the Draft Programmatic EA.

11        44.   The Commission challenged the assumption in the Draft Programmatic

12   EA that the use of WSTs would remain at low historical rates (21 fracking

13   treatments and 3 acidizing treatments since 1982), as well as the finding that

14   impacts to water quality and marine life would be insignificant due to dilution.  The

15   Commission was also critical of the lack of evidence regarding the composition of

16   WST chemicals and the absence of sampling data.  The Commission recommended

17   that Defendants select a less environmentally damaging alternative such as No

18   Action, prohibiting ocean discharge, or other restrictions until further studies on the

19   effects of WSTs could be conducted.  The Commission also re-emphasized the need

20   for Defendants to engage in consistency review pursuant to the CZMA regarding

21   offshore WSTs.

22        45.   In its comment letter, DOGGR disagreed with the stated Purpose and

23   Need of the Draft Programmatic EA ("to allow certain WSTs") given that it was the

24   same as the Proposed Action and restricted the consideration of alternatives.

25   DOGGR also recommended that Defendants consider additional alternatives, such

26   as disclosure of WST fluid constituents, notification to state agencies prior to WSTs

27   or waste discharges, and testing of waters following WSTs to address data gaps.

28   Until toxicity testing is conducted and the effects of waste fluids on marine life are

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                    17

1   better understood, DOGGR supported Alternative 3 (no open water discharge) as an

2   appropriate alternative.  DOGGR further noted the CCST Study's conclusion that

3   record keeping for WSTs in federal waters does not meet state standards, and

4   recommended that "[a]dditional assessment of the impacts of ocean discharge

5   should be conducted."

6       46.   A letter from 11 members of the California Legislature stated that the

7   Draft Programmatic EA "inadequately analyzes impacts to California's ocean and

8   coastline," and found Defendants' conclusions to be "troubling."  The members

9   cited the CCST Study's recommendation that the contents of fracking effluent be

10  disclosed, that fracking and acidizing effluent be chemically evaluated, and that

11  waters be protected from such waste discharges.  The members urged a

12  continuation of the moratorium on offshore WSTs "until a more comprehensive

13  evaluation focused on impacts to marine life, ecosystems, and coastal communities

14  is completed."

15      47.   Defendants released the Final Programmatic EA on May 27, 2016,

16  making only minor changes and clarifications from the earlier draft.  For example,

17  Defendants redrafted the purpose and need statement to provide that "[t]he purpose

18  of the proposed action (use of certain WSTs, such as hydraulic fracturing) is to

19  enhance the recovery of petroleum and gas from new and existing wells on the

20  POCS, beyond that which could be recovered with conventional methods (i.e.,

21  without the use of WSTs)."  Defendants determined that Alternative 1, the

22  Proposed Action, would not cause any significant impacts.

23      48.   On the same date, Defendants issued a FONSI stating their determination

24  that "the Proposed Action would not cause any significant impacts," and that

25  "implementing the Proposed Action does not constitute a major federal action

26  significantly affecting the quality of the human environment within the meaning of

27  Section 102(2)(c)" of NEPA.

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

## FIRST CAUSE OF ACTION

### (Violations of NEPA and the APA:  Unlawful Reliance on a FONSI and Failure to Prepare an Environmental Impact Statement
### 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3; 5 U.S.C. § 706)

49.    Paragraphs 1 through 48 are re-alleged and incorporated herein by reference.

50.    NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposed activity before taking action.  *See* 42 U.S.C. § 4332.  To achieve this purpose, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  *Id*. § 4332(2)(C); 40 C.F.R. § 1502.3.  To determine whether a federal action will result in significant environmental impacts, the federal agency may first conduct an EA.  40 C.F.R. §§ 1501.4, 1508.9.  An EA must include a discussion of the need for the proposal, alternatives to the proposed action, the environmental impacts of the proposed action and alternatives, and must provide "sufficient evidence and analysis for determining whether to prepare" an EIS or a FONSI.  *Id*. § 1508.9.

51.    NEPA's implementing regulations specify several factors that an agency must consider in determining whether an action may significantly affect the environment, thus warranting the preparation of an EIS.  40 C.F.R. § 1508.27.  The presence of any single significance factor can require the preparation of an EIS.  The presence of several significance factors, when considered cumulatively, can also require the preparation of an EIS.  "The agency must prepare an EIS if substantial questions are raised as to whether a project may cause significant environmental impacts."  *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir. 2014).

52.    As the comment letters from the Commission, DOGGR, and others on the Draft Programmatic EA demonstrate, there are substantial questions, if not

1    certainties, as to whether the proposed action may have significant environmental

2    impacts.  The Final Programmatic EA and FONSI authorize activities that may

3    have a significant effect on the environment under several of the NEPA

4    significance factors.  40 C.F.R. § 1508.27(b).  In particular, the Proposed Action:

5    (1) has the potential to result in significant adverse impacts such as water pollution,

6    air pollution, increased seismic activity, and climate change impacts; (2) will

7    impact an area with "unique characteristics" and "ecologically critical areas," as the

8    coastal waters of the Pacific OCS contain some of the most highly diverse marine

9    environments in the world and are home to dozens of state and federally-listed

10   species; (3) is "highly controversial" as evidenced by the numerous organizations,

11   state agencies, legislators, and individuals who submitted comments that were

12   highly critical of the Draft Programmatic EA, as well as state legislation (Senate

13   Bill 1132) that has been introduced to prohibit offshore WSTs until the impacts of

14   such activities are properly understood; (4) involves "possible effects on the human

15   environment" that are "highly uncertain or involve unique or unknown risks"; and

16   (5) establishes a negative precedent for future approval of WSTs on the Pacific

17   OCS without additional environmental review.

18       53.   Defendants' determination that the Proposed Action would result in no

19   significant impacts, and its reliance on a FONSI and failure to prepare an EIS,

20   constitutes agency action unlawfully or unreasonably withheld or delayed, in

21   violation of the requirements of NEPA.  5 U.S.C. § 706(1).  Alternatively,

22   Defendants' determination that the Proposed Action would result in no significant

23   impacts, and its reliance on a FONSI and failure to prepare an EIS, is arbitrary and

24   capricious, an abuse of discretion, and contrary to the requirements of NEPA.  5

25   U.S.C. § 706(2).

26   / / /

27   / / /

28   / / /

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                              20

1

2

3

4

**SECOND CAUSE OF ACTION**

**(Violations of NEPA and the APA:**

**Failure to Properly Consider Environmental Impacts**

**42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.1, 1508.9; 5 U.S.C. § 706)**

5

6

54.   Paragraphs 1 through 53 are re-alleged and incorporated herein by reference.

7

8

9

10

11

12

13

14

15

55.   An EA must discuss the "environmental impacts of the proposed action" and "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)–(b); *see id*. § 1500.1(b).  NEPA requires that an agency disclose and consider the direct, indirect, and cumulative impacts of its decision on the environment. *Id*. §§ 1502.16, 1508.7, 1508.8, 1508.25(c).  Moreover, "[t]he information must be of high quality.  Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id*. § 1500.1(b).

16

17

18

19

20

21

22

23

24

25

26

27

28

56.   Here, Defendants' findings in the Final Programmatic EA that WSTs on the Pacific OCS will result in no significant impacts are based on several unfounded assumptions, rather than sufficient evidence or analysis.  For example, Defendants assume that WSTs will occur only infrequently in the future, despite the fact that many of the state's offshore wells are nearing the end of their useful life using traditional methods, and WSTs are expanding in use nationwide.  Defendants also assume that compliance with existing regulations will address environmental concerns, such as water quality issues, even though an agency cannot excuse itself from conducting the required "hard look" under NEPA because an activity is conducted pursuant to another permit or because impacts have been discussed in a "non-NEPA document." *See South Fork Band Council of Western Shoshone v. U.S. Dept. of Interior*, 588 F.3d 718, 726 (9th Cir. 2009).  Furthermore, Defendants assert that the dilution of chemicals and other WST waste fluids in ocean waters

1   will render any impacts insignificant, without any evidence or analysis to support

2   such an assertion.  Finally, the Final Programmatic EA improperly relies on the

3   lack of information regarding the impacts of offshore WSTs to find that there will

4   be no significant impacts from the Proposed Action, rather than conducting the

5   necessary analysis in order to obtain such knowledge.  *Nat'l Parks & Conservation*

6   *Ass'n*, 241 F.3d at 733.  Each of these assumptions is unsupported by the record and

7   does not constitute the "hard look" required by NEPA.

8       57.   Defendants' failure to take the required "hard look" at the impacts of the

9   Proposed Action in the Final Programmatic EA is arbitrary and capricious, an abuse

10   of discretion, and contrary to the requirements of NEPA.  5 U.S.C. § 706(2).

**THIRD CAUSE OF ACTION**

**(Violations of NEPA and the APA:**

**Improper Purpose and Need Statement**

**40 C.F.R. § 1508.9; 5 U.S.C. § 706)**

15       58.   Paragraphs 1 through 57 are re-alleged and incorporated herein by

16   reference.

17       59.   NEPA requires federal agencies to "briefly specify the underlying

18   purpose and need to which the agency is responding in proposing the alternative

19   including the proposed action."  40 C.F.R. § 1508.9(b).  Since "[t]he stated goal of

20   a project necessarily dictates the range of reasonable alternatives … an agency

21   cannot define its objectives in unreasonably narrow terms."  *City of Carmel-by-the-*

22   *Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).  Rather, an

23   action agency must consider its "statutory authorization to act" in relation to the

24   proposed project.  *Citizens Against Burlington v. Busey*, 938 F.2d 190, 196 (D.C.

25   Cir. 1991).

26       60.   Here, the Final Programmatic EA's stated purpose and need is unduly

27   narrow and, in effect, is the same as the Proposed Action.  In particular, the stated

28   purpose and need is "to enhance the recovery of petroleum and gas from new and

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                      22

existing wells on the [Pacific] OCS, beyond that which could be recovered with conventional methods (i.e., without the use of WSTs)."  The Proposed Action itself is to "allow use" of offshore WSTs.  Nowhere does the purpose and need statement reflect the requirements of OCSLA to ensure that "environmental safeguards" are in place for offshore oil development or "to balance orderly energy resource development with protection of the human, marine, and coastal environments."  43 U.S.C. §§ 1332(3), 1802(2)(B).  This unduly narrow purpose and need statement also improperly constrained the consideration of reasonable alternatives.

61.  Defendants' failure to properly define its purpose and need statement for the Proposed Action in the Final Programmatic EA is arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA.  5 U.S.C. § 706(2).

### FOURTH CAUSE OF ACTION
### (Violations of NEPA and the APA:
### Failure to Consider Reasonable Alternatives
### 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9; 5 U.S.C. § 706)

62.  Paragraphs 1 through 61 are re-alleged and incorporated herein by reference.

63.  NEPA requires that a federal agency "rigorously explore and objectively evaluate all reasonable alternatives" to a proposed action.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.14(a); 1508.9(b).  The requirement to consider reasonable alternatives "lies at the heart of any NEPA analysis."  *California ex rel. Lockyer v. U.S. Dept. of Agric.*, 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006).

64.  Here, while Defendants developed two alternatives that would place some restrictions on the use of offshore WSTs (Alternatives 2 and 3), they failed to consider other reasonable alternatives suggested by the Commission, DOGGR, and other commenters.  These reasonable alternatives included prohibiting the use of WSTs in specific locations or at particular times of the year; requiring the

1  disclosure of WST fluid constituents and additives; requiring notice to state

2  agencies and the public prior to conducting WSTs or waste discharges; or limiting

3  the number of WSTs in a given year.  The Final Programmatic EA failed to

4  adequately explain why such alternatives were not reasonable.

5      65.   Defendants' failure to consider reasonable alternatives to the Proposed

6  Action in the Final Programmatic EA is arbitrary and capricious, an abuse of

7  discretion, and contrary to the requirements of NEPA.  5 U.S.C. § 706(2).

8  **FIFTH CAUSE OF ACTION**

9  **(Violations of the CZMA and APA:**

10  **Failure to Prepare A Consistency Determination for the Proposed Action**

11  **16 U.S.C. § 1456(c)(1)(A); 15 C.F.R. § 930.36; 5 U.S.C. § 706)**

12      66.   Paragraphs 1 through 65 are re-alleged and incorporated herein by

13  reference.

14      67.   Defendants have violated and continue to violate 16 U.S.C. §

15  1456(c)(1)(A) and 15 C.F.R. § 930.36 by failing to prepare a determination as to

16  whether the Proposed Action is consistent to the maximum extent practicable with

17  the enforceable policies in California's coastal management program.  The

18  Commission has not received such a determination from Defendants.

19      68.   It is reasonably foreseeable that the Proposed Action will have coastal

20  effects that are inconsistent with enforceable policies in California's coastal

21  management program pertaining to marine resources, biological productivity and

22  quality of coastal waters, and the prevention of oil and hazardous substance spills,

23  among other policies.  Cal. Pub. Res. Code §§ 30230-32.  The Proposed Action, for

24  instance, relies on an NPDES General Permit for discharges from the production

25  platforms, but the NPDES General Permit contains no limitations on the discharge

26  of specific WST chemicals (other than perhaps discharge limits on oil and grease,

27  to the extent those may constitute WST chemicals).  The Proposed Action also

28  contains no limitations on the volume or type of chemicals used in WSTs.

1  Moreover, the Proposed Action adds new environmental impacts by extending the

2  life of aging oil infrastructure, allowing for the recovery of additional oil, and

3  requiring the transport of chemicals and equipment to and from production

4  platforms.

5      69.  Defendants' failure to prepare a consistency determination pursuant to the

6  CZMA for the Proposed Action is arbitrary and capricious, an abuse of discretion,

7  and is contrary to the requirements of the CZMA.  5 U.S.C. § 706(2).

8                              **PRAYER FOR RELIEF**

9      WHEREFORE, Plaintiffs respectfully request that this Court:

10     1.    Issue a declaratory judgment that Defendants acted arbitrarily,

11  capriciously, contrary to law, abused their discretion, and failed to follow the

12  procedure required by law in their approval of the Final Programmatic EA and

13  FONSI, in violation of NEPA and the APA;

14     2.    Issue a declaratory judgment that Defendants acted unlawfully and

15  unreasonably, and failed to follow the procedure required by law, by failing to

16  prepare a consistency determination for the Proposed Action, in violation of the

17  CZMA and the APA;

18     3.    Issue a mandatory injunction compelling Defendants to set aside their

19  approvals of the Final Programmatic EA and FONSI unless and until they comply

20  with NEPA, the CZMA, and the APA by preparing an EIS for the Proposed Action

21  and submitting a consistency determination to the Commission for review;

22     4.    Issue a mandatory injunction prohibiting Defendants from issuing

23  approvals for offshore WSTs on the Pacific OCS unless and until Defendants

24  comply with NEPA, the CZMA, and the APA by preparing an EIS for the Proposed

25  Action and submitting a consistency determination to the Commission for review;

26     5.    Award Plaintiffs their costs, expenses, and reasonable attorneys' fees;

27  and

28     6.    Award such other relief as this Court deems just and proper.

COMPLAINT FOR DECLARATORY AND                    25
INJUNCTIVE RELIEF

1  Dated:  December 19, 2016          Respectfully submitted,

2                                     KAMALA D. HARRIS
                                      Attorney General of California
3                                     JAMEE JORDAN PATTERSON
                                      DAVID A. ZONANA
4                                     Supervising Deputy Attorneys General

5

6                                     /s/ George Torgun
                                      GEORGE TORGUN
7                                     DAVID ALDERSON
                                      Deputy Attorneys General
8                                     *Attorneys for Plaintiffs People of the*
                                      *State of California, ex rel. Kamala D.*
9                                     *Harris, Attorney General, and*
                                      *California Coastal Commission*
10

11  OK2016950020
    90737624.doc
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND          26
INJUNCTIVE RELIEF